FILED BY _AH_ D.C.

Oct 28, 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 28, 2020

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  19-10361-AA
Case Style: Michael Fox v. The Ritz-Carlton Hotel Company
District Court Docket No: 1:17-cv-24284-JLK

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

# UNITED STATES COURT OF APPEALS
## For the Eleventh Circuit

_____

No. 19-10361

_____

District Court Docket No.
1:17-cv-24284-JLK

MICHAEL FOX,
on behalf of himself and all others similarly situated,

                              Plaintiff - Appellant,

versus

THE RITZ-CARLTON HOTEL COMPANY, LLC,

                              Defendant - Appellee.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the judgment of this Court.

Entered: September 29, 2020
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

————————————————

No. 19-10361

————————————————

D.C. Docket No. 1:17-cv-24284-JLK

MICHAEL FOX,

Plaintiff-Appellant,

versus

THE RITZ-CARLTON HOTEL COMPANY, L.L.C.,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(September 29, 2020)

Before LUCK, ED CARNES, and MARCUS, Circuit Judges.

LUCK, Circuit Judge:

If a Florida restaurant is going to add "an automatic gratuity or service charge"

to a customer's bill, it must give notice "on the food menu and on the face of the

bill" that the automatic gratuity is included. Fla. Stat. § 509.214. If a restaurant in Miami-Dade County adds an "automatic tip," it must post a notice "conspicuously, either on a sign or in a statement on the business's menu or price listing in the same form and manner as the other items on the menu or price listing, and written in a legible manner in English, Spanish and Creole." Mia.-Dade County, Fla., Code of Ordinances § 8A-110.1(3). And a Florida restaurant cannot include a gratuity or tip as part of the taxable sales price for food and drinks if the gratuity is separately stated on the customer's receipt and the restaurant receives no benefit from the gratuity. Fla. Admin. Code § 12A-1.0115(7)(a).

Michael Fox, according to the allegations in his class action complaint, ate at three restaurants over two days at the Ritz-Carlton Hotel Company, LLC's Key Biscayne location. At the first restaurant, Fox was charged an automatic gratuity without notice. At the second restaurant, Fox was charged an automatic gratuity with an inadequate and deceptive notice. And at the third restaurant, Fox had to pay an automatic gratuity with an inadequate and deceptive notice, and he had to pay sales tax on the gratuity. Fox, for himself and all the others who paid illegal automatic gratuities and sales taxes at Ritz-Carlton's forty-nine restaurants in Florida over the last four years, sued the hotel for violating the Florida Deceptive and Unfair Trade Practices Act and Florida's tax regulations. Fox sought damages, a tax refund, and declaratory and injunctive relief.

The district court dismissed the complaint for lack of subject-matter jurisdiction because Fox did not have standing to sue on behalf of the customers that paid automatic gratuities at Ritz-Carlton restaurants that Fox did not visit and because Fox's class claims did not meet the $5 million jurisdictional trigger under the Class Action Fairness Act.  The district court also dismissed the tax refund claim for lack of subject-matter jurisdiction because Fox did not exhaust his administrative remedies.

We affirm the dismissal of the tax refund claim on exhaustion grounds.  But we agree with Fox that the district court erred in finding that he did not have standing to represent the class because he only paid the illegal automatic gratuity at three of Ritz-Carlton's restaurants.  And we agree with Fox that the class complaint alleged in good faith that the amount-in-controversy for the hundreds of thousands of Ritz-Carlton guests in Florida that unlawfully paid an automatic gratuity over the last four years exceeded $5 million.  We reverse that part of the district court's order and remand for further proceedings.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### *The complaint's allegations*

Fox, on April 5 and 6, 2017, ate at three of Ritz-Carlton Key Biscayne's restaurants.  First, on April 5, he ate at Key Pantry.  Fox's bill, in addition to his food and drinks, included an eighteen percent automatic gratuity.  The printed and online

menus for Key Pantry, however, did not mention the automatic gratuity.  Still, Fox paid the entire bill.

Later on April 5, Fox ate at the Cantina Beach restaurant.  The menu explained in small type, "A suggested [eighteen percent] gratuity will be added to your check for your convenience."  But the gratuity was not suggested—the bill included eighteen percent as an automatic gratuity, which Fox paid.

And on April 6, Fox ate at the Lightkeepers restaurant.  On the menu, printed in small, italicized type, it read:  "A suggested [eighteen percent] gratuity will be added to your check.  Please feel free to raise, lower, or remove this gratuity at your discretion."  But the bill included a mandatory eighteen percent gratuity that Fox could not raise, lower, or remove.  The gratuity was included in the sales tax calculation, even though the menu said that any automatic fee would be a non-taxable gratuity.  The Lightkeepers restaurant also added a line below the bill total for an additional gratuity.

Fox alleged that Ritz-Carlton engaged in a pattern of deceptive practices across forty-nine of its Florida restaurants.  He alleged that Ritz-Carlton had a practice of adding automatic gratuities without an adequate disclosure and of adding automatic, mandatory gratuities after telling customers that they were only suggested.  The hotel also purportedly had a practice of informing customers of an automatic gratuity, but when the bill came it would refer to the automatic gratuity as

4

a "service charge" and would solicit an additional gratuity.  And Ritz-Carlton would improperly charge sales tax on its automatic gratuities.

Fox filed this class action complaint against Ritz-Carlton on behalf of himself and all the others who, over the last four years, paid the illegal automatic gratuity and sales tax under the hotel's practice at its forty-nine Florida restaurants. Count one alleged a per se violation of the Florida Deceptive and Unfair Trade Practices Act because Ritz-Carlton did not give "adequate notice" of "an automatic gratuity or service charge," in violation of section 509.214 of the Florida Statutes and section 8A-110.1(3) of the Miami-Dade County Code of Ordinances.  Count two alleged a violation of the Florida Deceptive and Unfair Trade Practices Act because Ritz-Carlton failed to give adequate notice of its mandatory gratuities, deceived customers about the ability to raise or lower the automatic tip, and solicited an additional gratuity on top of what was already included in the bill.  Count three claimed that Ritz-Carlton violated rule 12A-1.0115 of the Florida Administrative Code by charging sales tax on the mandatory gratuities.

Fox alleged that the district court had subject-matter jurisdiction over his class action complaint under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Fox alleged that the parties were diverse because he was a citizen of New York and Ritz-Carlton was a citizen of Delaware and Maryland.  And Fox claimed that the amount-in-controversy was more than $5 million because the class included hundreds of

thousands of Ritz-Carlton customers who were charged illegal automatic gratuities and sales tax at its ten hotels and forty-nine restaurants in Florida over a four-year period.

*The district court dismissed the complaint*

The district court dismissed counts one and two of Fox's complaint for lack of subject-matter jurisdiction.  First, the district court ruled that Fox did not suffer an injury-in-fact fairly traceable to the forty-six Ritz-Carlton restaurants that he did not visit and thus did not have standing to bring those claims on behalf of the class. Second, the district court found that Fox did not have standing to represent class members who ate at the same three restaurants he did but on different days because notice of the mandatory gratuity could have changed throughout the class period. And third, the district court found that Ritz-Carlton "could only be liable to a given class member for the amount of gratuity the class member paid in excess of what he or she <u>would</u> have paid in gratuity absent the allegedly deceptive automatic [eighteen percent] gratuity."  The district court found that many customers would have tipped at least fifteen percent and up to twenty-five percent.  Because Fox only had standing to bring claims on behalf of customers who dined at the three restaurants at the Key Biscayne hotel and only on the days Fox dined at those restaurants and because the damages amount was limited to the difference between what customers would have paid as gratuity and what they were illegally required to pay, the district court

concluded that the good faith allegations in the complaint did not allege a class damage amount of more than $5 million, as required by the Class Action Fairness Act.  See 28 U.S.C. § 1332(d)(2).

The district court also dismissed count three for lack of subject-matter jurisdiction.  The district court ruled that Florida law provided no private right of action for violations of rule 12A-1.0115.  And even if it did, the district court explained, Fox had not exhausted his administrative remedies before filing suit for a refund of the taxes paid on the automatic gratuities, as required by Florida law. The district court dismissed the complaint and closed the case.  Fox appeals the dismissal for lack of subject-matter jurisdiction.

## STANDARD OF REVIEW

We review de novo a district court's dismissal for lack of subject-matter jurisdiction.  Est. of Bass v. Regions Bank, Inc., 947 F.3d 1352, 1358 (11th Cir. 2020).

## DISCUSSION

Fox contends that the district court erred in finding that he did not meet the $5 million amount-in-controversy requirement under the Class Action Fairness Act, which was in turn based on the court's error in concluding that he did not have standing to represent the class members who paid illegal gratuities at the Florida Ritz-Carlton's restaurants where Fox had not dined.  Fox also argues that the good-

faith allegations in the complaint showed that the class paid more than $5 million in illegal gratuities.  Finally, Fox contends that the district court erred by dismissing his tax refund claim on exhaustion grounds because he had no administrative remedies to exhaust.

*The Class Action Fairness Act's amount-in-controversy requirement*

The Class Action Fairness Act provides that the district courts "shall have original jurisdiction" over class actions that have at least 100 members, an amount-in-controversy exceeding $5 million, and minimal diversity between the parties (that is, any member of the proposed class must be a citizen of a state different from any defendant).  <u>See</u> 28 U.S.C. § 1332(d); <u>see also</u> <u>Dart Cherokee Basin Operating Co.</u> <u>v. Owens</u>, 574 U.S. 81, 84–85 (2014).  In calculating the amount-in-controversy, "the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of [$5 million], exclusive of interest and costs."  28 U.S.C. § 1332(d)(6).

"If the jurisdictional amount is either stated clearly on the face of the documents before the court, or readily deducible from them, then the court has jurisdiction."  <u>Cappuccitti v. DirecTV, Inc.</u>, 623 F.3d 1118, 1122 n.8 (11th Cir. 2010) (per curiam) (quoting <u>Lowery v. Ala. Power Co.</u>, 483 F.3d 1184, 1211 (11th Cir. 2007)).  Of course, the amount-in-controversy alleged in the complaint controls only if the allegations are made in "good faith."  <u>Id.</u> (citing <u>St. Paul Mercury Indem. Co.</u>

v. Red Cab Co., 303 U.S. 283, 288–89 (1938)).  A district court need not "suspend

reality or shelve common sense in determining whether the face of a complaint, or

other  document,  establishes  the  jurisdictional  amount."   Pretka v. Kolter City

Plaza II, Inc., 608 F.3d 744, 770 (11th Cir. 2010).  "'[T]he pertinent question is what

is in controversy in the case, not how much the plaintiffs are ultimately likely to

recover' as a result of the lawsuit."  Anderson v. Wilco Life Ins. Co., 943 F.3d 917,

925 (11th Cir. 2019) (quoting Pretka, 608 F.3d at 751).

Here, the face of Fox's complaint met the jurisdictional requirements of the

Class Action Fairness Act.  Fox alleged that:  he was a citizen of New York and

Ritz-Carlton was a citizen of Delaware and Maryland (meeting the minimal diversity

requirement); the proposed class consisted of hundreds of thousands of customers

who dined at the forty-nine Ritz-Carlton restaurants in Florida over the last four

years and were charged an illegal automatic gratuity (meeting the class size

requirement); and the amount-in-controversy exceeded $5 million (meeting the

damages requirement).

No one argues that Fox's complaint was facially insufficient, assuming that

he had the standing he claims and the amount-in-controversy allegations were made

in good faith.  But the parties do disagree about the standing and amount-in-

controversy issues.

Class representative standing

Fox contends that the district court erred in finding he did not have standing to represent the class members who paid the illegal automatic gratuities at Ritz-Carlton's Florida restaurants other than Key Pantry, Cantina Beach, and Lightkeepers.  Fox has standing, he says, because he had the same interest and was injured the same way as the other class members—they all had to pay the illegal automatic gratuities under Ritz-Carlton's common business practice—and that is enough for class representative standing.

Article III of the Constitution limits our authority to deciding "Cases" and "Controversies."  U.S. Const. art. III, § 2.  "[T]he traditional understanding of a case or controversy" requires a plaintiff to demonstrate "[s]tanding to sue."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).  Standing requirements apply with no less force in the class action context.  Lewis v. Casey, 518 U.S. 343, 357–58, 358 n.6 (1996).  Article III requires two related, but distinct, inquiries to determine whether a class representative has "standing to represent a class."  Mills v. Foremost Ins. Co., 511 F.3d 1300, 1307 (11th Cir. 2008).  First, the class representative must "satisfy the individual standing prerequisites" of the case or controversy requirement.  Id. Second, the class representative "must also 'be part of the class and possess the same interest and suffer the same injury as the class members.'"  Id. (quoting Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000)).  "[A]t the

pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element" of standing.  Spokeo, 136 S. Ct. at 1547 (internal quotation marks omitted).

The first inquiry is the familiar three-part standing test that requires a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Id.  The second inquiry focuses on the relation between the class representative's injuries and those he alleges on behalf of the class.  "[I]t is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim."  Prado, 221 F.3d at 1279.

We applied these class representative standing principles in Mills.  There, the plaintiff-policyholders proposed a class of "mobile home insurance policyholders in Florida" who submitted claims under policies issued by the defendant for damages "arising from four hurricanes that struck Florida in August and September 2004 (Hurricanes Charlie, Frances, Ivan, and Jeanne)."  511 F.3d at 1302.  The plaintiffs themselves suffered damage only from Hurricane Frances.  Id.  The named plaintiffs alleged two individual claims against their insurance company:  (1) that it failed to compensate them fully under their policy; and (2) that it failed to inform them that the insurer wouldn't pay for certain costs.  Id. at 1307.  To determine whether the

named plaintiffs had class representative standing, we compared those two individual injuries to the injuries they alleged on behalf of the proposed class. Id. We concluded that those injuries were "identical," giving the named plaintiffs class representative standing. Id.

Here, Fox alleged that he was injured by Ritz-Carlton when it:  (1) charged him an illegal automatic gratuity; and (2) charged sales tax on the automatic gratuity. No one disputes that Fox suffered an individual injury-in-fact fairly traceable to Ritz-Carlton's allegedly deceptive practices.  See Debernardis v. IQ Formulations, LLC, 942 F.3d 1076, 1084 (11th Cir. 2019) ("Certainly, an economic injury qualifies as a concrete injury.").  A favorable judicial decision would likely redress that injury by awarding Fox damages against Ritz-Carlton.  See Resnick v. AvMed, Inc., 693 F.3d 1317, 1324 (11th Cir. 2012) ("Plaintiffs allege a monetary injury and an award of compensatory damages would redress that injury.").  And Fox has standing for each of his claims because he alleged facts that show he was injured by Ritz-Carlton both from its illegal automatic gratuity policy and from its charge of sales tax on the automatic gratuity.

Fox also alleged that the hotel employed those same practices at all forty-nine of its restaurants in Florida across a four-year period and that the class members therefore suffered the same economic injury from the illegal automatic gratuities and sales tax.  Much like in Mills, Fox's alleged injuries and the class's alleged injuries

are "identical."  511 F.3d at 1307.  In <u>Mills</u>, we did not require purported class members to have suffered the same kind of property damage on the same day in the same part of Florida from the same hurricane.  Rather, we looked to the nature of the injury, which stemmed from the defendant's alleged breach of the insurance policy by refusing to pay claims for property damage.  <u>See id.</u>  The policies were breached regardless of which hurricane caused what damage on what day in which part of Florida.  Fox and the class members have suffered the same economic injury from Ritz-Carlton's gratuity and sales tax practices across its properties in Florida.  While those injuries may have occurred on different days at different restaurants, those facts do not change what injuries Fox alleged those class members suffered.

Ritz-Carlton and the district court mix up the class representative standing inquiry.  They conflate the requirements of individual standing with those for a class representative.  As the district court noted, Fox surely would not have individual standing to assert claims concerning Ritz-Carlton restaurants where he did not dine because he suffered no injury fairly traceable to those restaurants.  <u>See</u> <u>Spokeo</u>, 136 S. Ct. at 1547.  But class representative standing does not necessarily require that the class representative suffer injury at the same place and on the same day as the class members.  <u>Mills</u>, 511 F.3d at 1307.  Rather, it requires that the named plaintiff and class members have the same interest and suffer the "same injury."  <u>Prado</u>, 221

F.3d at 1279.  Because Fox has the same interest and suffered the same injury as the class members, he has class representative standing to bring the claims he alleged.

<u>Amount-in-controversy</u>

The district court also found, and Ritz-Carlton argues, that there were no good faith allegations that the amount-in-controversy exceeded $5 million because:  (1) under the Florida Deceptive and Unfair Trade Practices Act, the hotel "could only be liable to a given class member for the amount of gratuity the class member paid in excess of what he or she <u>would</u> have paid in gratuity absent the allegedly deceptive automatic [eighteen percent] gratuity"; and (2) "class members would have been aware of the customary payment of [fifteen to twenty percent] gratuity at a restaurant . . . [and] many customers would have paid [fifteen percent] gratuity, some others [twenty-five percent]."  There are three problems with the district court's conclusions.

First, we aren't as sure as the district court about whether the Florida Deceptive and Unfair Trade Practices Act limits damages to the difference between what customers would have paid and what they were required to pay, or instead allows the class to recover the full amount of the deceptive charge.  <u>Compare</u> <u>Bowe v. Pub. Storage</u>, 106 F. Supp. 3d 1252, 1270 (S.D. Fla. 2015) (discussing <u>Latman v. Costa Cruise Lines, N.V.</u>, 758 So. 2d 699, 703 (Fla. 3d DCA 2000)) (noting that in a class action over improper access fees, "the full amount of the access fees would

then be an appropriate measure of FDUTPA damages"), with <u>Waste Pro USA v. Vision Constr. ENT, Inc.</u>, 282 So. 3d 911, 920 (Fla. 1st DCA 2019) ("The measure of actual damages in cases where the alleged deceptive practice is defendant's misrepresentation of why a fee is being charged and where the money for the fee is being transferred is the amount retained by defendant despite the representation that the amount will be transferred to a third-party." (internal quotation marks omitted)). Second, there is no support in the record, and none is cited in its order, for the district court's finding that "many customers would have paid [fifteen percent] gratuity, some others [twenty-five percent]." <u>Contra</u> Scott Edwards, <u>Tipping in America: How Does Your State Stack Up?</u>, Simple, https://www.simple.com/blog/simple-insights-lets-talk-tipping (last visited Sept. 10, 2020) (reporting that the average tipping rate in Miami, Florida is 10.5%). The district court can make common-sense inferences about the jurisdictional amount from the face of the complaint, but it cannot speculate or hypothesize about facts that are not in the record. <u>Pretka</u>, 608 F.3d at 752, 770 (A district court need not "suspend reality or shelve common sense in determining whether the face of a complaint, or other document, establishes the jurisdictional amount," but it is "impermissible speculation for a court to hazard a guess on the jurisdictional amount in controversy without the benefit of any evidence [on] the value of individual claims." (alteration in original) (internal quotation marks omitted)). And third, the district court improperly turned the amount-in-controversy

inquiry into a discussion on "how much the plaintiffs are ultimately likely to recover," which is not the proper jurisdictional measure under the Class Action Fairness Act.  See Anderson, 943 F.3d at 925.

But even if we assume that Florida law limited damages to the difference between what customers would have tipped and what they were required to tip, and that the district court's finding about the tipping habits of Florida customers was not complete speculation, the allegation that the amount-in-controversy exceeded $5 million would still have been made in good faith.  Fox alleged that forty-nine Ritz-Carlton restaurants improperly charged an automatic gratuity and sales tax to hundreds of thousands of customers across a four-year period.  Even though class members may have overpaid only some percentage of the total bill each time they ate at the hotel's Florida restaurants, added up over hundreds of thousands of customers across four years at ten Ritz-Carlton hotels and forty-nine restaurants, we do not need to suspend reality to conclude that the overpayment was more than $5 million.  The district court therefore erred in dismissing counts one and two for lack of subject-matter jurisdiction.

*Florida sales tax refund claim*

The district court dismissed count three because Fox did not exhaust his administrative remedies before filing his sales tax refund claim.  Fox contends that we should reverse because there were no administrative remedies to exhaust.

Because Fox brings his claim for a refund under state law, the Erie[1] doctrine "commands that we apply the substantive law of Florida, the forum state, in this diversity action filed in the Southern District of Florida."  Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1020 (11th Cir. 2014).  "In interpreting Florida law, we look first for case precedent from the Florida Supreme Court.  Where we find none, we are bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise."  Id. at 1021 (internal quotation marks omitted).

"Florida has established a statutory procedure for obtaining a refund of a tax payment where no tax was due."  State Dep't of Highway Safety & Motor Vehicles v. Rendon, 957 So. 2d 647, 653 (Fla. 3d DCA 2007).  Section 215.26 of the Florida Statutes "provides the mechanism" for obtaining a tax refund.[2]  Sarnoff v. Fla. Dep't of Highway Safety & Motor Vehicles, 825 So. 2d 351, 355 (Fla. 2002).  Under that section, "an individual is required to request a refund" through the statutorily-defined administrative process "before proceeding to [Florida] circuit court."  Id. "The taxpayer may bring suit if the taxpayer's administrative request for a refund is

---

[1] Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

[2] Section 215.26 provides, "The [c]hief [f]inancial [o]fficer may refund to the person who paid same . . . any moneys paid into the State Treasury which constitute:  (a) [a]n overpayment of any tax . . . (b) [a] payment where no tax, license, or account is due; and (c) [a]ny payment made into the State Treasury in error . . . ."  Fla. Stat. § 215.26(1).  A taxpayer must file an application for a refund with Florida's chief financial officer or her delegate on a form approved by her.  Id. § 215.26(2).  Section 215.26 offers "the exclusive procedure and remedy for refund claims between individual funds and accounts in the State Treasury."  Id. § 215.26(4).

denied." Rendon, 957 So. 2d at 653–54.  Exhaustion of administrative remedies

applies to claims for refunds both from the state and from the dealer that collected

the tax.  See BJ's Wholesale Club, Inc. v. Bugliaro, 273 So. 3d 1119, 1121 (Fla. 3d

DCA 2019).  "Since the statute requires that an aggrieved party pursue his or her

administrative remedies prior to filing a lawsuit, [a Florida] trial court [lacks] subject

matter jurisdiction" if the plaintiff fails to exhaust those administrative remedies.  Id.

The BJ's court dealt with facts similar to those in this case.  There, the plaintiff

brought a Florida Deceptive and Unfair Trade Practices Act claim against the dealer,

BJ's, for "improperly imposing on and collecting from its members a charge

denominated as a 'sales tax.'"  Id. at 1120.  The complaint sought both injunctive

relief and "damages, including a tax refund."  Id. at 1121.  Given the request for a

tax refund, the court concluded that the plaintiff and class members "were required

to exhaust their administrative remedies with the Department of Revenue pursuant

to section 215.26."  Id.  Because the plaintiff didn't, the Florida court lacked subject-

matter jurisdiction.  Id.

As a Florida intermediate appellate decision, and without "some persuasive

indication" that the Florida Supreme Court would rule otherwise, Winn-Dixie, 746

F.3d at 1020,  BJ's controls this case and required Fox to exhaust his administrative

remedies before filing a lawsuit for a tax refund.  The BJ's case also addresses Fox's

contention, raised at oral argument, that, because he brought his claim under the

Florida Deceptive and Unfair Trade Practices Act, he had no administrative remedies to exhaust.  The BJ's plaintiff sued under the same Act.  273 So. 3d at 1120.  But regardless of the nature of the claim, because the plaintiff's remedy was for a "tax refund," she needed to exhaust the administrative procedures in section 215.26 before going to the courts.  Id. at 1121.

Fox also sought a tax refund.  Count three of his complaint sought a "refund" of the allegedly overpaid tax on the automatic gratuities.  Fox's opening brief refers to his requested relief as a refund of the tax and cites Florida's regulatory provisions governing refunds of sales tax.  And the brief reiterates Fox's request for the repayment of the allegedly overcharged tax.  Like the plaintiff in BJ's, Fox must comply with section 215.26 before suing for a tax refund.

Given that Fox failed to exhaust his administrative remedies, we also have to decide whether the district court properly dismissed his claim for lack of subject-matter jurisdiction.  The former Fifth Circuit has previously held that Erie requires us to apply state law concerning the exhaustion of administrative remedies.  See Woods v. Holy Cross Hosp., 591 F.2d 1164, 1168–70 (5th Cir. 1979).  And we have held that a federal court does not have diversity subject-matter jurisdiction over a claim for which a state court would not have jurisdiction.  See Connolly v. Md. Cas. Co., 849 F.2d 525, 528 (11th Cir. 1988).

In <u>Woods</u>, the plaintiff sued in federal court under Florida's medical malpractice act, which required a claimant to submit her dispute to an administrative mediation panel before suing in state court.  591 F.2d at 1166–67.  If the claimant did not pursue the administrative remedy, the act "precluded [her] from bringing any action based on medical malpractice in any court of the state of Florida."  <u>Id.</u> at 1167 (internal quotation marks omitted; alteration adopted).  The plaintiff did not comply with the mediation requirement before suing, and the district court dismissed her claim on that ground.  <u>Id.</u> at 1166.  We affirmed, reasoning that <u>Erie</u> required us to apply Florida's administrative exhaustion requirement in federal court because otherwise non-resident plaintiffs could forum shop by filing a diversity action in federal court without exhausting Florida's administrative remedies and "justice would be inequitably applied between resident and non-resident malpractice claimants."  <u>Id.</u> at 1170.

In <u>Connolly</u>, the plaintiffs sued a workers' compensation insurance carrier in federal court for mishandling a claim.  849 F.2d at 525.  The district court dismissed the complaint for lack of subject-matter jurisdiction because Florida's workers' compensation act provided the exclusive remedy for the plaintiffs' claims.  <u>Id.</u>  We affirmed.  Florida had created "an exclusive remedy for [an] employee's work related claims, and [deprived a state court of] jurisdiction over an employee's claim against an employer, or its compensation carrier, for additional damages for injuries

covered by the Act." Id. at 526.  We concluded that because Florida law created a jurisdictional bar for filing in state court, the district court similarly had no jurisdiction to hear the diversity action.  Id. at 528.

Here, the district court properly applied section 215.26's administrative exhaustion requirement to this federal suit.  Both in Woods and in this case, Florida law precluded filing a suit in state court unless the plaintiff complied with the administrative procedure.  Woods, 591 F.2d at 1167; BJ's, 273 So. 3d at 1121.  Woods makes clear that Erie requires us to apply Florida's law on administrative exhaustion and to treat an unexhausted claim the same way that Florida state courts would.  591 F.2d at 1170.  Failing to apply Florida's rule would encourage non-resident plaintiffs to sue in federal court for a tax refund to avoid the administrative requirement and would cause an inequitable application of justice between resident and non-resident plaintiffs.  See id.  Both in Woods and here, the plaintiffs did not exhaust their administrative remedies.  See id. at 1166.  Thus, the district court here, like the district court in Woods, properly dismissed the claim for failure to comply with the administrative exhaustion requirement.  See id.

And the district court properly dismissed count three for lack of subject-matter jurisdiction.  Connolly shows that in a diversity action, a federal court must enforce a jurisdictional bar that would apply to the plaintiff's claim in state court.  849 F.2d at 528.  Like the workers' compensation act in Connolly, Florida courts have read

21

section 215.26 to create a jurisdictional bar for filing a tax refund claim if the plaintiff did not exhaust his administrative remedy.  See BJ's, 273 So. 3d at 1121. Because Fox did not follow that administrative process, the district court correctly applied the jurisdictional bar to dismiss count three.  And because we affirm the dismissal on exhaustion grounds, we do not reach the district court's alternative ruling that Florida's administrative code does not create a private right of action for a tax refund.

## CONCLUSION

We reverse the part of the district court's order dismissing counts one and two for lack of subject-matter jurisdiction and remand for further proceedings consistent with this opinion.  We also reverse the part of the district court's order dismissing counts four and five to the extent they seek declaratory and injunctive relief as part of the Florida Deceptive and Unfair Trade Practices Act claims in counts one and two.  We affirm the rest of the district court's order.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED for further proceedings.**

 SIMPLE

Banking    **Log In** Budgeting    Tackling Debt    Goals    **Apply Now** Relationships & Money    About Simple

**Budgeting**

BY SCOTT EDWARDS

Expenses

Goals

Safe-To-Spend

Get The App

Blog

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

BUDGETING

About Simple

**Banking**

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

**Help**

FAQs

Support Articles

ATM Finder

Contact Us

# Tipping in America: How Does Your State Stack Up?

In this edition of Simple Insights, we analyzed anonymized transactions at restaurants, bars and coffee shops and looked at the average tipping rate.

SHARE:  f 🐦 P ✉ 🔊



One of my favorite Simple features is seeing how much I tip on transactions at restaurants, or how much cash back I get at the register. I love being able to search for "tipped" and instantly bring up a list of every tip I've ever left on Simple. We get a lot of Twitter love from our customers for this feature, too.

Log In      Sign Up      Customer Relations      Apply Now      About Simple

**Budgeting**

Expenses

Goals

Safe-To-Spend®

Get The App

**Banking**

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

Because Simple makes it so easy to know your tipping habits, our last Simple Insights post generated requests for some stats on tips. We analyzed anonymized transactions at restaurants, bars and coffee shops and looked at the average tipping rate. We looked at four slices of data. Tipping rates by state, city, hour of the day and day of the week. Here is what we found.

**Blog**

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

**Help**

FAQs

Support Articles

ATM Finder

Contact Us

## Tipping Analysis by State

Page: 3 of 18

Date: 04/29/2020   Case: 19-10361


SIMPLE

Log In    Apply Now

Banking    Budgeting    Tackling Debt    Goals    Relationships & Money    About Simple

## Budgeting

Expenses

Goals

Safe-To-Spend®

Get The App

## Banking

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

## Blog

Banking

Budgeting

## Help

FAQs

Support Articles

ATM Finder

Contact Us

Tackling Debt

Goals

Relationships & Money

About Simple

### 5 States with the highest tipping rate

### 5 States with the lowest tipping rate

| 1. Montana | 16.3% |
|---|---|
| 2. Wyoming | 16.1% |
| 3. Colorado | 15.2% |
| 4. Alabama | 15.0% |
| 5. West Virginia | 15.0% |

| 1. Utah | 10.6% |
|---|---|
| 2. Delaware | 11.1% |
| 3. Hawaii | 11.1% |
| 4. New Jersey | 11.1% |
| 5. New York | 11.3% |

States also tended to cluster together along regional lines. The tri-state area, and the Northeast in general tip in a tight band between 11% and 12%. Likewise, Southern states cluster between 13% and 14%. Here in the Pacific Northwest, Oregon and Washington are very similar in their tipping behavior at more than 14%. The Great Plains States hover around 13%, while Ohio, Indiana and Michigan are all very close to 14.5%. Idaho and Utah are two islands of low tipping rates amongst higher tipping surrounding Western States. It's also interesting to see that while California is separated by 3000 miles from New York, it tips at very similar rates to Northeastern states.

Let's briefly talk about the caveats in our data. Simple hasn't signed up everyone in the United States (yet). As such this data is limited to spending recorded by Simple, and can be influenced by demographic differences between our customers and national representative samples. Additionally it's likely tips are sometimes left in cash, or disproportionately split between parties. Transactions classified as coming from restaurants could of course be takeout or delivery orders, which typically result in lower tips than traditional meals at a restaurant. Likewise if certain areas frequent coffee shops more than others, overall mean tip rates could be affected.

Phew! Now that that's out of the way, let's move on to cities.

## Tipping Analysis by City

The chart above shows tip rates by city. The darker the color, the greater the tipping rate.

Let's go one layer deeper and look at tipping behaviors at the city level. Only cities with at least 75,000 people were considered in this view.

SIMPLE

Log In    Apply Now

Budgeting    Banking
Expenses    Online Checking
Goals    High Yield Accounts
Safe-To-Spend®    Shared Checking
Get The App    Certificates Of Deposit
    Personal Loans
    Mobile Banking Features

Help

Blog

FAQs

Support Articles

Banking    About Takeout
Budgeting

Spend    Send Money

Relationships & Money

About Simple

## 5 cities with the highest tipping rate

SIMPLE

Banking  **Log In** Budgeting  Tackling Debt  Goals  Relationships & Money  **Apply Now** About Simple

**Budgeting**

Expenses

Goals

Safe-To-Spend®

Get The App

**Banking**

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

### 5 cities with the highest tipping rate

| | |
|---|---|
| 1. New Orleans, LA | 16.8% |
| 2. Columbus, OH | 16.1% |
| 3. Denver, CO | 16.0% |
| 4. Richmond, VA | 15.8% |
| 5. Portland, OR | 15.6% |

### 5 cities with the lowest tipping rate

| | |
|---|---|
| 1. Sunnyvale, CA | 9.7% |
| 2. Irvine, CA | 9.9% |
| 3. Mountain View, CA | 10.4% |
| 4. Miami, FL | 10.5% |
| 5. San Jose, CA | 10.9% |

**Blog**

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

**Help**

FAQs

Support Articles

ATM Finder

Contact Us

Again, we find some fascinating regional trends emerging. In casual internal polling prior to running this data, many people we asked thought New York City would have the highest tip rate. The data shows medium sized cities end up tipping the most, with New Orleans topping the charts.

 **SIMPLE**

Whereas tipping rates are around the 15% mark in northern Florida, Miami tips less, at about 10%.

Log In     Apply Now
Banking   Budgeting   Tackling Debt   Goals   Relationships & Money   About Simple

**Budgeting**
Expenses
Goals

**Banking**
Online Checking
High Yield Accounts
Credit Cards
Personal Loans
Mobile Banking Security

**Blog**
Banking
Budgeting
Tackling Debt
Goals
Relationships & Money
About Simple

**Help**
FAQs
Support Articles
ATM Finder
Contact Us

Tipping is generally strong across cities in America's heartland. Mid-sized cities like Raleigh, Indianapolis, Columbus, and Louisville all tipped better than 14% on average.

Bay Area cities' average tipping rates were the lowest nationwide– most of their rates hovered around 10%. Meanwhile in SoCal, there is a gradual decline in tipping rates as you move from Santa Barbara (13.5%) down to Irvine (9.8%).

## Tipping Rates by Time of Day

🗙 tipping-simple-insights-tipping-by-hour

The time of day has an impact on how much we tip, which isn't so surprising when you think about it. What is fascinating is how dramatic the change is over the course of a day.

We don't tip very much in the early morning, starting off at around 7%. Tips rise gradually through the morning and then dip again just before and during the 12pm lunch hour. As soon as 1pm hits, tips jump up to 12%. Once happy hour arrives tips

Case: 19-10361   Date (Ð3 bf 42)0/29/2020   Page: 7 of 18

gradually rise, then accelerate the later it gets. Tips top out at an amazing 23% in the 1am hour. Tips steadily drop off in the wee hours of the morning.

Why is this happening? Well there are a number of possible explanations for this trend. The most obvious is many of us go to coffee shops and bakeries in the morning where tipping is not as expected. At lunch it's also common to pick up your order and bring it back to the office. In the late evening, its more likely for us to be eating at restaurants with table service or drinking at bars with open tabs. Not to mention the later it gets, the more likely our math skills suffer from one too many drinks.

## Tipping Rates by Day of the Week

tipping-3-simple-insights-tipping-by-day

Tipping is at its lowest on Mondays, then gradually rises throughout the week, peaking on Saturday. This isn't very revelatory, but it's fascinating to see the cyclical weekly pattern. The biggest day over day gains are seen on Friday and Saturday. More people head out to bars and dinners out on weekends, so it's not surprising to see the uptick here.

If you've got a question you'd like answered about spending and saving trends with Simple, let us know on Facebook, Twitter, or Google+. Use the hashtag #simpleinsights. And learn how Simple can help you get confident with your money.

Learn More

Budgeting                                    Banking

Expenses                                     Online Checking

Goals                                        High Yield Accounts

Safe-To-Spend                                Shared Checking

Set Targets                                  Certificates of Deposit

                                             Personal Loans

                                             Mobile Banking Security

Blog                                         Help

Banking                                      FAQs
Budgeting

Tackling Debt                                Support Articles

Goals                                        ATM Finder

Relationships & Money                        Contact Us

About Simple

SIMPLE

The data in this post is composed of the last 12 months of transactions categorized in the restaurant, bar or coffee shop categories for all Simple customers. Each customer's average tipping rate was calculated, then aggregated to city and state levels. For time-of-day and day-of-week calculations the time the transaction was recorded was used. Tipping rates reported are mean tipping rates, though median tipping rates were close to the mean in most cases.

Log In   Relationship Checking   Time-Of-Day and Day-Of-Week Calculations   Apply Now

**Budgeting**

Expenses

Goals

Safe-To-Spend®

Get The App

**Banking**

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

## Interested in getting started with Simple? Apply now!

SGS

**Blog**

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

**Help**

FAQs

Support Articles

Contact Us

Did you like this article? Yes / No

Disclaimer: Hey! Welcome to our disclaimer. Here's what you need to know to safely consume this blog post: Any outbound links in this post will take you away from Simple.com, to external sites in the wilds of the internet; neither Simple or our partner bank, BBVA USA, endorse any linked-to websites; and we didn't pay/barter with/bribe anyone to appear in this post. And as much as we wish we could control the cost of things, any prices in this article are just estimates. Actual prices are up to retailers, manufacturers, and other people who've been granted magical powers over digits and dollar signs.

**TRENDING STORIES**

Build a Saving Habit with a Protected Goals Account

Budgeting, Saving, and Banking: Get the Most out of Simple

SIMPLE

How to Budget with No (or Low) Income

Banking     Budgeting     Tackling Debt     Goals     Relationships & Money     About Simple

Log In                                        Apply Now

## Budgeting

Expenses

Goals

Safe-To-Spend®

Get The App

## Banking

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

## Blog

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

## Help

FAQs

Support Articles

ATM Finder

Contact Us

Case: 19-10361    Date Filed: 02/01/2020    Page: 10 of 18



Banking   **Log In**   Tackling Debt   Goals   **Apply Now**   About Simple
          Budgeting                          Relationships & Money

## Budgeting

Expenses

Goals

Safe-To-Spend®

Get The App

## Banking

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

## Blog

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

## Help

FAQs

Support Articles

ATM Finder

Contact Us



Banking          **Log In**          Tackling Debt          Goals          **Apply Now**          About Simple
                 Budgeting                                              Relationships & Money

## Budgeting

Expenses

Goals

Safe-To-Spend®

Get The App

## Banking

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

## Blog

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

## Help

FAQs

Support Articles

ATM Finder

Contact Us


Case: 19-10361      Date Filed: 04/29/2020      Page: 11 of 18

 SIMPLE

Log In

Banking   Budgeting   Tackling Debt   Goals   Relationships & Money   About Simple

**Apply Now**

## Budgeting

Expenses

Goals

Safe-To-Spend®

Get The App

## Banking

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

## Blog

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

## Help

FAQs

Support Articles

ATM Finder

Contact Us



Banking          **Log In**          Tackling Debt      Goals          **Apply Now**          About Simple
                 Budgeting                                     Relationships & Money

## Budgeting

Expenses

Goals

Safe-To-Spend®

Get The App

## Banking

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

## Blog

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

## Help

FAQs

Support Articles

ATM Finder

Contact Us

Page: 14 of 18

Date Filed: 04/29/2020

Case: 19-10361


SIMPLE

Banking    **Log In**    Tackling Debt    Goals    **Apply Now**    About Simple
          Budgeting                              Relationships & Money

## Budgeting

Expenses

Goals

Safe-To-Spend®

Get The App

## Banking

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

## Blog

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

## Help

FAQs

Support Articles

ATM Finder

Contact Us

 SIMPLE

Banking | **Log In** Budgeting | Tackling Debt | Goals | **Apply Now** Relationships & Money | About Simple

**Budgeting**

Expenses

Goals

Safe-To-Spend®

Get The App

**Banking**

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

**Blog**

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

**Help**

FAQs

Support Articles

ATM Finder

Contact Us

TAGS

Personal Finance

Case: 19-10361    Date Filed: 07/29/2020    Page: 15 of 18



**SIMPLE**

# Recommended Stories

**Budgeting**

Adopt These 3 Money Mindsets and Save More

Benefits of Direct Deposit for Simple Customers

Budgeting: Stay on Top of Your Finances

- Expenses
- Goals
- Save vs. Spend

Get The App

**Banking**

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

**Blog**

Banking

- Budgeting

Tackling Debt

- Goals

Relationships & Money

About Simple

Apply Now

**Help**

FAQs

- Support Articles

ATM Finder

Contact Us

# Banking and budgeting in one simple app.

Open your account in just a couple minutes.

**Company**

About Us

Press

Careers

Reviews

**Help**

ATM Finder

FAQ

Support Articles

Switch

Case: 19-10361     Date Filed: 04/29/2020     Page: 17 of 18



Disclosures, Privacy & Licensing

Schedule of Fees

Banking Info

Sitemap

Status

Accessibility

| | Log In | | | Apply Now | |
|---|---|---|---|---|---|
| Banking | Budgeting | Tackling Debt | Goals | Relationships & Money | About Simple |

## Budgeting

Expenses

Goals

Safe-To-Spend®

Get The App

## Banking

Online Checking

High Yield Accounts

Shared Checking

Certificates Of Deposit

Personal Loans

Mobile Banking Security

## Blog

Banking

Budgeting

Tackling Debt

Goals

Relationships & Money

About Simple

## Help

FAQs

Support Articles

ATM Finder

Contact Us